JOHANNA KENNEDY, Appellee, *vs.* THE MODERN WOOD-
MEN OF AMERICA, Appellant.

*Opinion filed February 16, 1910.*

1. EVIDENCE—*evidence tending to overcome the presumption of death from absence may be impeached.* In an action on a benefit certificate, where the plaintiff relies upon the presumption of death from seven years' unexplained absence, a witness who testifies to having seen the missing man during that period may be impeached, and the mere fact that his testimony is not contradicted by any witness does not require the court, on motion to direct a verdict, to accept his testimony as true, but it is for the jury to determine his credibility and say whether the presumption of death is rebutted.

2. SAME—*mere rumor that person is living does not necessarily rebut presumption of death.* A mere rumor that an absent person has been seen does not necessarily rebut the presumption of death arising from seven years' unexplained absence even though such rumor is not followed by diligent search and inquiry, but its probative force must be governed by the particular facts and circumstances of the case.

3. SAME—*how failure to follow up information of missing person may be excused.* Failure of a wife to follow up information concerning her missing husband may be excused by showing that the source from which the information came was so corrupt or so unreliable as to destroy its value.

4. SAME—*hearsay evidence, when admissible, is subject to impeachment.* Hearsay evidence, when admitted under some exception to the rule excluding that character of evidence, becomes subject to the general rules of law which govern the impeachment of evidence.

5. SAME—*when veracity of person who has not testified may be impeached.* Where the defendant in an action on a benefit certificate draws out, on cross-examination of the plaintiff, an admission that she had been told that a certain woman had reported having seen the missing husband of the plaintiff within seven years after his disappearance, the plaintiff is entitled to call witnesses to prove that the reputation of such woman for truth was bad and that she had made conflicting statements of the matter.

6. SAME—*when testimony as to general reputation for truth is not too remote.* The fact that the person whose general reputation for truth and veracity is attacked has for a period of ten years before the trial lived in a distant place, does not render too

remote in point of time the testimony of former neighbors as to her reputation for truth when she lived in their neighborhood. (*Holmes* v. *Stateler*, 17 Ill. 453, and *Blackburn* v. *Mann*, 85 id. 222, followed.)

7. SAME—*facts from which law presumes death need only be proved by a preponderance of the evidence.* In a civil suit the facts from which the law presumes the death of a missing person must be proved by a preponderance of the evidence, but it is not necessary that the evidence shall be sufficient to remove all reasonable doubt that such person is alive.

8. SAME—*when proof of inquiry after period of seven years is proper.* An inquiry as to the whereabouts of a missing person during the period of the seven years subsequent to his disappearance may be made after such seven years have elapsed, and proof that such inquiry has been made is not improper.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Douglas county; the Hon. SOLON PHILBRICK, Judge, presiding.

TRUMAN PLANTZ, GEORGE G. PERRIN, and W. W. REEVES, for appellant:

A state once shown to have existed is presumed to continue, so that after proof of existence there is a presumption of a continuance of life. 19 Am. & Eng. Ency. of Law, 74; Greenleaf on Evidence, sec. 41; *In re Hall,* 1 Wall. Jr. 85; *Whiting* v. *Nicoll,* 46 Ill. 241; *Executor* v. *Canfield,* 15 N. J. Eq. 119; *Reedy* v. *Millizen,* 155 Ill. 636.

Absence for seven years is not, alone, sufficient to raise the presumption of death. It must also be made to appear that the person has not been heard from. *Brown* v. *Jewett,* 18 N. H. 230; *In re Hall,* 1 Wall. Jr. 85; *Commonwealth* v. *Thompson,* 11 Allen, 25; *Modern Woodmen* v. *Gerdom,* 82 Pac. Rep. 1100; *Hitz* v. *Ahlgren,* 170 Ill. 60.

The burden of establishing the presumption of death is upon the plaintiff who makes the assertion that a person is dead and has not been heard from for more than seven years, and before a court is justified in presuming the

death of a person because of his absence, all reasonable doubt of his being alive at a given period ought to be removed. *Smith* v. *Combs,* 24 Atl. Rep. 9; *Duke of Cumberland* v. *Graves,* 9 Barb. 608; *Wilson* v. *Hodges,* 2 East, 313; *Modern Woodmen* v. *Gerdom,* 82 Pac. Rep. 1100; *Garwood* v. *Hasings,* 38 Cal. 229.

The fact that the missing man was heard from subsequent to his disappearance destroys the presumption of death arising from his disappearance. *Winter* v. *Knights of Pythias,* 96 Mo. App. 1; *Smith* v. *Smith,* 49 Ala. 158.

A party relying upon the presumption of death, arising from an absence for a period of seven years without being heard from after diligent inquiry, must show that he has followed up all clues and information received by him concerning the whereabouts of the person since his disappearance. *In re Boerum,* 173 N. Y. 321; *McCartee* v. *Camel,* 1 Barb. Ch. 455.

Hearsay evidence is competent in cases of this kind. *Modern Woodmen* v. *Gerdom,* 82 Pac. Rep. 1100.

It is not proper to impeach a witness by showing her general reputation for truth and veracity in a neighborhood where she resided ten or twelve years prior to the time she testifies, without showing that she has been a wandering person and has not acquired a residence since that time. This is especially true when the witness was a girl just growing into womanhood, and her character had not become well fixed at the time when she resided in the neighborhood of and was known to the witnesses called to impeach her. *Kirkham* v. *People,* 170 Ill. 9; *Blackburn* v. *Mann,* 85 id. 222; *Holmes* v. *Stateler,* 17 id. 453.

ECKHART & MOORE, J. M. MERICA, and JOHN H. CHADWICK, for appellee:

Absence for seven years without the whereabouts being known and without having been heard from during that period raises a presumption of death at the expiration of

that time. *Reedy* v. *Millizen,* 155 Ill. 638. *Hitz* v. *Ahlgren,* 170 id. 63.

Mere rumor that the absent party is dead or living can not be received in evidence either to aid or rebut the presumption of life. *Johnson* v. *Johnson,* 114 Ill. 616.

In civil actions only a preponderance of evidence is required to establish facts, and not that the evidence shall leave no reasonable doubt in the minds of the jury. *Railroad Co.* v. *Lane,* 83 Ill. 453.

Juries are required, in civil cases, to decide facts upon the weight or preponderance of the evidence, and this, too, where the proof does not show the fact in question to the satisfaction of the jury. In such cases the jury may find any given fact in a given way upon their judgment as to the weight or preponderance of the evidence, though they may have reasonable doubts as to the real truth. The law in such cases does not demand that every material allegation be established to the satisfaction of the jury, and it was error to tell the jury so in the instruction. *Stratton* v. *Railway Co.* 95 Ill. 32.

Mr. JUSTICE HAND delivered the opinion of the court:

This was an action of assumpsit commenced in the circuit court of Douglas county on the 31st day of January, 1907, by the appellee, Johanna Kennedy, against the appellant, the Modern Woodmen of America, upon a benefit certificate issued by the appellant to James Kennedy, bearing date the 19th day of February, 1896, and in and by which certificate the appellant agreed to pay to the appellee, the wife of James Kennedy, in case of his death, the sum of $2000. A trial resulted in a judgment and verdict in favor of the appellee, and the appellant prosecuted an appeal to the Appellate Court for the Third District, where the judgment of the circuit court was affirmed, and a further appeal has been prosecuted to this court.

The declaration, in substance, averred that James Kennedy, on the 13th day of December, 1898, suddenly and without explanation left and departed from his home, situated near Tuscola, in Douglas county, and that he has been unaccountably absent, and has never returned to his home or been heard of by the appellee although she has made diligent and continuous search for him ever since his disappearance, and that she has been unable, to find him, or any trace of him, although she has made diligent search and inquiry for him, and that by reason of his continued absence for seven years the law presumes said James Kennedy to be dead, and the declaration averred that the said James Kennedy departed this life on the 13th day of December, 1898. The general issue was filed.

At the close of the plaintiff's evidence, and again at the close of all the evidence, the appellant made a motion for a directed verdict in its favor, which motion was denied, and the action of the court in denying said motion is assigned as error. It is also assigned as error that the trial court committed error in its rulings upon the admission and rejection of evidence produced on behalf of the appellee and offered on behalf of the appellant, and in modifying and refusing instructions offered on behalf of appellant.

By a stipulation found in the record every fact necessary to authorize a recovery in favor of the appellee was admitted by the appellant except the death of James Kennedy, and the principal question presented by this record is, does the evidence introduced by the appellee raise the presumption of the death of James Kennedy? No direct proof of the death of James Kennedy was introduced, but the presumption of death arising from his continued and unexplained absence for the period of seven years subsequent to December 13, 1898, is relied upon to sustain the verdict and judgment.

The undisputed evidence shows that James Kennedy was forty-two years of age and had been for a number

of years a farmer living near Tuscola with his wife and
six minor children, the eldest of whom, a daughter, was
about sixteen years of age at the time of his disappear-
ance; that the relations between Kennedy and his family
were kindly and affectionate and that no reason or excuse
existed which would justify or explain his disappearance;
that on the day he disappeared he was in the city of Tus-
cola with his wife and returned to his home in the evening
in a happy and contented frame of mind; that he had on
his person about $200 in cash; that he told his family he
was going to Champaign by the early train that evening to
pay the rent due upon the farm upon which they resided,
which would fall due on the first day of January, and that
he would return to Tuscola on the train which arrived at
that place from Champaign about one o'clock the next
morning, and requested them to leave sufficient coal in the
room for him to replenish the fire on his return and to
leave the south door unlocked so that he could get into the
house on his return; that he went to the depot in Tuscola
in the evening and purchased a ticket for Champaign; that
while waiting for the train he was in his usual frame of
mind and talked with a number of people; that he said to
an acquaintance by the name of Smith, at the depot, that
he had come to meet some parties and that he was going
to some town near by the next week; that when the train
going to Champaign arrived he left the waiting room and
went out onto the platform and was observed going in the
direction of the train; that when he did not return to his
home after the train arrived from Champaign the next
morning upon which he was expected, his wife and chil-
dren were alarmed, and they and his neighbors and friends
immediately commenced to search and inquire for him;
that they inquired of the trainmen in charge of the train
going to Champaign, telephoned to Champaign, wrote let-
ters of inquiry to his relatives and friends in adjoining and
remote cities and to his relatives at the place of his nativity

in Ireland but received no information relative to his whereabouts, and that he has never been seen or heard of by his family, neighbors, relatives or friends since he was seen at the depot in the city of Tuscola on the evening of December 13, 1898.

The law is well settled in this State that where a person leaves home with the expectation of returning thereto within a short time and he remains away and his absence is unexplained and unaccounted for and no intelligence is received from him and he is not heard from, and his whereabouts cannot be ascertained although diligent search and inquiry are made in the vicinity of his home and at such places as he would be likely to go and from such persons as he would be likely to meet and know and nothing is heard from or of him, and he remains away from his family and home for the period of seven years, a presumption arises from these facts that he is dead, unless there are other facts and circumstances shown which will rebut and overcome such presumption of death. *Whiting* v. *Nicoll,* 46 Ill. 230; *Johnson* v. *Johnson,* 114 id. 611; *Reedy* v. *Millizen,* 155 id. 636; *Hitz* v. *Ahlgren,* 170 id. 60; *Policemen's Benevolent Ass'n* v. *Ryce,* 213 id. 9.

The only testimony found in this record which it is claimed by the appellant tends to rebut the presumption that James Kennedy was dead at the time this suit was brought is the testimony of William E. Rogers, a witness residing in the city of Peoria, whose deposition was read on the hearing, who stated that he saw James Kennedy in Salt Lake City, Utah, in the year 1900, and the statement of appellee, drawn out on cross-examination, that she was informed in the year 1904 by her son that Myrtle King Rogers, the wife of William E. Rogers, had told him in a store in the city of Tuscola, in the year 1904, that she had seen his father in Salt Lake City in the year 1900. The witness William E. Rogers, in his deposition used in this trial, testified that he had no personal acquaintance with

James Kennedy; that he had never spoken to him but on one occasion and that he had seen him but three times,— twice in Tuscola in 1898, when he did not speak to him, and once in Salt Lake City in 1900, when he talked to him but a few minutes.

At the time James Kennedy disappeared he had a benefit certificate in the Court of Honor upon his life in which his wife was named as beneficiary and upon which suit was brought at about the time the suit upon the policy in question was commenced, and upon the trial of which case William E. Rogers testified as a witness orally, and his evidence given in that case is found in the record in this case. In the trial of this case proper foundation of impeachment was laid for the purpose of using the testimony given by William E. Rogers upon his examination in the Court of Honor case; and the testimony of William E. Rogers given in the trial of the Court of Honor case, relating to his acquaintance with James Kennedy and his means of identifying him at the time that he claimed he saw him in Salt Lake City, is materially different from the statements made by him in his deposition read in evidence on the trial of this case. Appellee was also permitted, over the objection of the appellant, after the proper foundation for impeachment had been laid, to prove by T. N. Cofer, county judge of Coles county, that during the trial of the Court of Honor case he occupied a room on the second floor of the hotel in Tuscola adjoining a room occupied by Rogers and his wife; that there were double doors between the rooms; that between ten and eleven o'clock at night the witness heard Mrs. Rogers say that the attorney for the defendant told her he would get the money by the latter part of the week,—by Saturday night,—to compensate them; that she told the attorney it was about the first of the month and they were hard up for money. Witness also testified that he heard Mrs. Rogers say, "Don't you remember that I introduced you to Kennedy in Salt Lake City?" and that

Rogers replied, "I believe I do;" that Mrs. Rogers said Kennedy was about forty-five years old, was a heavy man, weighing one hundred and sixty or one hundred and eighty pounds, had dark hair, heavy, sandy moustache, was slightly stooped and "had a peculiar walk, like this," followed by foot-falls on the floor.

The appellant contends that the impeachment of William E. Rogers by his former testimony and by the testimony of Cofer was improper, and urges that his testimony should have been assumed by the court to have been true upon the presentation of its motion to take the case from the jury, and as Rogers' testimony was uncontradicted it showed that James Kennedy was living in 1900, and that there could, by reason of a failure to establish the death of James Kennedy, be no recovery, and the court erred in not taking the case from the jury upon its motion for a directed verdict. It was a question of fact for the determination of the jury whether or not the presumption of death arising from the unexplained absence of James Kennedy for more than seven years, established by the evidence of the appellee, had been rebutted, and the court could not properly assume, upon the hearing of the motion for a directed verdict, that the evidence of William E. Rogers was true, but it was for the jury to determine the credibility to be given to the evidence of William E. Rogers. The jury were not bound absolutely by the evidence of William E. Rogers, although it was contradicted by no direct evidence. In *Podolski* v. *Stone,* 186 Ill. 540, the court, on page 547 of the opinion, quoted the following language from *Anderson* v. *Miljengren,* 52 N. W. Rep. 219: "A court or jury is not bound to accept it [the testimony] as true merely because there is no direct testimony contradicting it, where it contains such inherent improbabilities or contradictions which, alone or in connection with other circumstances in evidence, satisfy them of its falsity." And in *Quock Ting* v. *United States,* 140 U. S. 417, the court

said: "There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story." And the Appellate Court, in its opinion, in disposing of the testimony of William E. Rogers, said: "It would unduly extend this opinion to detail and discuss the evidence adduced upon the cross-examination of this witness, together with other evidence in the record introduced on behalf of appellee which tended to discredit his testimony. A most careful examination of the evidence persuades us that the jury were justified in concluding that the testimony of this witness was fabricated and that he was unworthy of belief." We are of the opinion that the impeachment evidence introduced to disparage the testimony of William E. Rogers was properly admitted, and think that the trial court did not err in declining to take the case from the jury upon his evidence, although the same was uncontradicted by the direct testimony of any witness.

It appears from the evidence of the appellee that on receiving, in the year 1904, through her son, the intelligence that Myrtle King Rogers claimed to have seen James Kennedy in Salt Lake City in the year 1900 she made no search or inquiry for James Kennedy in Salt Lake City prior to the commencement of this suit, for the reason, as she testified, that the reputation for truth and veracity of Myrtle King Rogers was bad and that she was of the opinion that it would avail nothing to make search and inquiry for James Kennedy in Salt Lake City, and it is urged by the appellant that the appellee, by reason of her failure to make search and inquiry for James Kennedy in Salt Lake City upon receiving through her son, in 1904, information that Myrtle King Rogers claimed to have seen James Kennedy

in Salt Lake City in 1900, is barred of her cause of action, as the presumption that James Kennedy was dead at the time her suit was brought has been rebutted.

In *Johnson* v. *Johnson, supra,* the defendant in error testified that about one year after her first husband left her, and in 1867, she received a letter from him, and from that time to the time of the trial, in August, 1884, she had not seen him or heard from him, but that she had heard rumors at one time that he was dead, and at another that he was living, and at another that he was married again. In reviewing the effect of this testimony as bearing upon the validity of defendant in error's second marriage, the court said (p. 616): "It has been repeatedly held that mere rumor that the absent party is dead or living cannot be received in evidence, either to aid or rebut the presumption of life;" and the wisdom of the rule of law thus announced by the court in that case is demonstrated in this case by the conduct of the witness Peter Wells. Wells had been in Chicago, and on his return he said to the son of appellee he had seen his father while in Chicago, giving the street number where he had seen him. On the conversation being repeated to the appellee and her family, her eldest son and daughter immediately went to Chicago in search of their father but learned nothing of him, and on Peter Wells being called as a witness on the trial of this case he admitted he had made the statement to appellee's son on his return from Chicago but stated that he did not see James Kennedy while in Chicago. He testified: "I was in Chicago September of last year; told Mrs. Kennedy's boy I saw his father some time last week; was at the eye and ear infirmary, on West Adams street, No. 227; saw the Kennedy boy in Newman; he came over to my house; asked me if I saw his father; I said yes; I said it as a joke; didn't tell the truth."

We think it clear that the failure to follow up information of the character received from Myrtle King Rogers

will not necessarily defeat the right of recovery in a case like the one at bar, on the ground that the receipt of such information, unless followed up by search and inquiry, as a matter of law rebuts the presumption of death arising from the lapse of seven years' absence, unexplained, of the party whose death is being investigated, but we are of the opinion that the probative force of such information, as bearing upon the presumption of death arising from the continued and unexplained absence of a party for the period of seven years, must be governed by the facts and circumstances surrounding each case under investigation. If such is not the rule of law in cases of this character, then in this case, as there is evidence found in the record that Myrtle King Rogers said she saw James Kennedy in Butte, Montana, Boise City, Idaho, and in the State of Minnesota, in order to establish the presumption of death by reason of the continued and unexplained absence of the party for seven years, it would have been necessary to prove on the trial in this case that diligent search and inquiry had been made for James Kennedy in the cities of Butte and Boise City and in the State of Minnesota, otherwise the presumption that James Kennedy was dead by reason of his long and unexplained absence, which covered a period of more than seven years, would have been rebutted by these statements of Myrtle King Rogers. We think, therefore, when the information as to the absent person who has been absent for a long period and whose absence has been unexplained amounts merely to a rumor, it does not have the effect necessarily to rebut the presumption of death arising from the lapse of time, as a mere rumor is often founded upon nothing substantial and may rest upon mere gossip, or may be put afloat by interested parties for the purpose of escaping liability, or with a view to defeat the presumption which arises from the unexplained absence of the party for the period of seven years. If, however, the intelligence is of such a tangible and definite character that, un-

explained, if reliable, it would rebut the presumption of death arising from the unexplained absence of a person for seven years, we think the failure to follow up such intelligence by due search and inquiry can, in a case like this, be excused by showing that the source from which the information came was so corrupt or so unreliable as to destroy its value,—and that was what was sought to be done in this case by calling witnesses to show that the statement made by Myrtle King Rogers was unreliable and unworthy of belief. A number of witnesses testified that her general reputation for truth and veracity was bad, and other witnesses testified she made statements to them that she had seen James Kennedy in Butte, Montana, Boise City, Idaho, and in the State of Minnesota, and that she had afterwards denied making to them such statements. The deposition of Myrtle King Rogers had been taken and was on file in this case but was not read in evidence, as doubtless the appellant hoped to obtain the benefit of her statement, without calling her as a witness, by relying upon the admission of the appellee that she had received intelligence, through her son, that Myrtle King Rogers had seen James Kennedy in Salt Lake City in 1900, instead of calling Myrtle King Rogers as a witness or reading her deposition in evidence on the trial, and thereby escaping the danger of the evidence of Myrtle King Rogers being impeached by direct contradiction or by witnesses who would swear that her general reputation for truth and veracity was bad. The appellant, by the course pursued, received the full benefit of the statement of Myrtle King Rogers. We think, therefore, if the appellant obtained, by the admission of the appellee, the benefit of the statement of Myrtle King Rogers upon the trial that she had seen James Kennedy in Salt Lake City in 1900, without calling her as a witness, it received the benefit of her statement subject to the same conditions and limitations as it would had she been called as a witness. The statement of Myrtle King Rogers reported to

the appellee by her son and testified to by the appellee was clearly hearsay evidence, and we think, when admitted, became subject to the general rules of law which govern the impeachment of hearsay evidence when such evidence, under some exception to the general rules against the admission of hearsay evidence, is properly received in evidence, as, for example, dying declarations, which are hearsay evidence, and which it is held may be impeached by any of the methods by which the evidence of the deceased could have been impeached had he been living and testified as a witness. (*Dunn* v. *People*, 172 Ill. 582; *Nordgren* v. *People*, 211 id. 425.) It is obvious, if this case is analogous to the cases cited,—and we think, on principle, it is,—the impeaching testimony hereinbefore referred to was properly admitted. If the appellant had called Myrtle King Rogers as a witness and she had testified on the trial of this case to the same statements she made to appellee's son about seeing his father in Salt Lake City in 1900, it would have been competent to have impeached her testimony in any of the methods allowed by law, and appellant cannot avail itself of the benefit of her statement that she saw the husband of appellee in Salt Lake City in 1900, and at the same time close the door of attack upon the credibility of the statement of Myrtle King Rogers by any method of impeachment which could have been used had she testified upon the witness stand. If the statement of Myrtle King Rogers can be used without subjecting it to impeachment, the effect would be to give to the statement of Myrtle King Rogers, made *ex parte* and not under oath, greater potency than if she had testified to the same statement as a witness, and to make her statement thereby immune from attack though she made the statement not under oath.

It is said, however, that the effect of permitting the witnesses to contradict the statement of Myrtle King Rogers, or to testify that her general reputation for truth and veracity is bad, is to permit a person to be impeached who

has not testified as a witness in the case. That is true; but the same is equally true where a dying declaration is impeached by some one of the modes provided by law for impeaching a person who has testified as a witness upon a trial and arises out of the necessity of the case.

It is said by the appellant, Myrtle King Rogers had not lived at Tuscola for about ten years previous to the trial of this case, and it is insisted that the testimony of witnesses who knew her when she lived at Tuscola, as to her general reputation for truth and veracity, related to a period too remote and for that reason was incompetent. This precise question was decided contrary to appellant's contention in *Holmes* v. *Stateler,* 17 Ill. 453, and *Blackburn* v. *Mann,* 85 id. 222, in both of which cases the reasons for the admissibility of impeaching testimony under such circumstances are fully set forth.

It is also urged that the court improperly modified appellant's fourth instruction and improperly refused to give to the jury appellant's thirteenth, fourteenth, fifteenth and sixteenth instructions. By the fourth instruction the court was asked to direct the jury that in arriving at a verdict they should consider all the evidence admitted by the court, including that relating to James Kennedy having been seen in Salt Lake City and other places, and the court modified the same by inserting therein the words "the reports of," so that as modified it read, "including that relating to the reports of James Kennedy having been seen," etc. The criticism of the modification is, that it excluded from the consideration of the jury the testimony of William E. Rogers that he had seen James Kennedy in Salt Lake City. We do not think the jury were misled by the modification. The testimony of William E. Rogers was included in the statement, "all the evidence admitted by the court," and the testimony of that witness was not excluded from the consideration of the jury by the modification of the instruction.

By the thirteenth and fourteenth instructions the court was requested to direct the jury that before a verdict could be found in favor of appellee the evidence must be sufficient to remove all reasonable doubt in their minds of James Kennedy being alive at the time the suit was commenced, and that if they entertained any doubt whether he was dead, the verdict should be for appellant. The refusal of these instructions was correct, as, this being a civil case, it was only necessary for the appellee to establish her case by a preponderance of the evidence. It is conceded that these instructions were contrary to the rule adopted in this State, but it is claimed that they are supported by authorities outside of this State, and this court is asked to follow those authorities. We think the rule announced in *Policemen's Benevolent Ass'n* v. *Ryce, supra,* where an instruction was considered laying down the rule that it was sufficient to entitle the plaintiff to recover in a case like this that he establish his case by a preponderance of the evidence, was a correct statement of the law.

By the fifteenth and sixteenth instructions the court was asked to direct the jury that if appellee heard of her husband being at any place after his disappearance it was her duty to make search and inquiry at such place, and if she failed to do so she could not recover. What we have previously said in this opinion renders unnecessary a further discussion of that question. In our opinion the instructions were properly refused.

It is also insisted that the court erred in declining to permit the son of appellee to state in full the statement made to him by Myrtle King Rogers at the time she informed him she had seen his father in Salt Lake City. The son gave the substance of that conversation and the substance of what he informed the appellee was said to him by Myrtle King Rogers. It may be that the cross-examination of the witness on the point in question was unduly limited, but we do not think appellant was preju-

diced thereby. The same may be said with reference to the refusal of the court to permit the mother of Myrtle King Rogers to testify what her daughter had reported to her with reference to seeing James Kennedy in Salt Lake City. There is no question but what the jury fully understood that Myrtle King Rogers claimed and repeatedly stated that she had seen James Kennedy in Salt Lake City, and the refusal to permit her mother to reiterate her story we do not think should reverse the case.

It is also said the court erred in permitting the appellee to prove she had written letters of inquiry with reference to James Kennedy to Salt Lake City since this suit was commenced. The letters were not introduced in evidence or called for by the appellant, although copies of the letters written and the replies received thereto were stated by appellee to be in the hands of her attorney, who was in court. For aught that appears, the letters, while written subsequent to the commencement of the suit, may have made inquiry as to the whereabouts of James Kennedy during the seven years subsequent to his disappearance from home and about the time Myrtle King Rogers claimed she saw Kennedy in Salt Lake City, which clearly would have been a proper subject of inquiry at the time the letters were written although it might not have been proper to make such inquiry with reference to the whereabouts of James Kennedy subsequent to seven years after his disappearance, which is not decided.

We have given this record the consideration which the importance of the case demands and are of the opinion it contains no reversible error.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*